[No. 24827. Department One. April 3, 1934.]

SEATTLE ASSOCIATION OF CREDIT MEN, *Respondent,*
v. BANK OF CALIFORNIA, NATIONAL ASSOCIATION,
*Appellant,* MAY W. LOWDON, *Individually and
as Administratrix, Cross-appellant.*[1]

*Kerr, McCord & Carey* and *S. N. Greenleaf,* for appellant.

*John W. Heal, Jr.,* for cross-appellant.

*Harroun, Maloy & Shidler,* for respondent.

MILLARD, J.—On January 16, 1931, the Multachrom Tubelight, Inc., a domestic corporation, of which Henry J. Lowdon was president, borrowed thirty-five hundred dollars, on its thirty-day promissory note, from the Bank of California, National Association.

[1]Reported in 30 P. (2d) 972.

o

131

Contemporaneous with the making of the loan, the bank obtained from the borrower a written general loan and collateral agreement obligating the borrower to assign to the bank invoices or accounts receivable as they came into existence. That agreement, so far as material, reads as follows:

"In order to obtain loans from and otherwise to deal with The Bank of California, National Association, hereinafter called the 'Bank,' and for other valuable considerations, the undersigned, for value received, hereby assigns, transfers, conveys and pledges to the Bank, as security for any and all indebtedness, obligation or liability of the undersigned to the Bank (or of others for whose obligations, indebtedness or liability the undersigned may be liable), now or hereafter existing, matured or not matured, absolute or contingent, individual or firm, (and in case this agreement is executed by more than one party, whether individual, joint or joint and several) wherever and whenever payable, the following, to-wit: all moneys, chattels, negotiable instruments, securities, bills of lading, warehouse receipts, policies of insurance, paper, credits, demands, choses in action, bonds, stocks, certificates, deposits rights and property of every kind, tangible or intangible, at any time in possession or control of the Bank or any of its agents or correspondents, or in transit to it, belonging to, for the account of, or subject to the order of the undersigned."

At this time, Henry J. Lowdon was individually indebted (the debt was approximately one year old) to the bank in the sum of two thousand dollars on a past-due unsecured promissory note. Some time between February 25 and March 4, 1931, Lowdon delivered to the bank, as collateral security for the payment of his indebtedness to the bank, a demand promissory note in the sum of $1,645.76, dated August 27, 1930, executed by the tubelight company in favor of Henry J. Lowdon. No payments had ever been made by the tube-

light company upon the note. In April, 1931, as additional collateral security for payment of the loan to him personally, Lowdon deposited with the bank certain life insurance policies.

The tubelight company's note for thirty-five hundred dollars matured February 16, 1931, at which time fifteen hundred dollars was paid thereon and a renewal note, payable February 25, 1931, was given by the tubelight company to the bank for the balance of two thousand dollars. This note was not paid at maturity; it was carried as past-due paper until March 4, 1931, when a renewal note for two thousand dollars, payable May 1, 1931, was given by the tubelight company to the bank.

At the time this renewal note was made and delivered to the bank, the tubelight company assigned to the bank, as collateral security for payment of the note, an account in the sum of $3,312 due the tubelight company from the National Theatre Supply Company. Under the terms of the loan and collateral agreement of the borrower with the bank at the time of the original loan of thirty-five hundred dollars, the borrower was obligated to assign to the bank invoices or accounts receivable as they came into existence. The account receivable in the sum of $3,312 did not come into existence until March 4, 1931. On that date, the renewal note payable May 1, 1931, was given by the tubelight company to the bank, and the invoice or account of $3,312 was, at the same time, assigned to the bank as security for payment of the borrower's pre-existing indebtedness. As soon as the account receivable was assigned to it, the bank notified the National Theatre Supply Company.

On April 24, 1931, the bank received $3,245.76 from the theatre supply company in payment of the account

receivable. That represents the amount due on the invoice less discounts. The bank applied the $3,245.76 to the payment of the pre-existing indebtedness of two thousand dollars due to the bank from the tubelight company and to the payment of the balance of $1,245.76 due by Henry J. Lowdon to the bank.

On January 16, 1931, when the original loan was made to the tubelight company, and on March 4, 1931, when renewal note for balance due thereon was given and the account receivable was assigned to the bank, the tubelight company was insolvent. The evidence abundantly supports the court's finding that:

"The Multachrom Tubelight, Inc., continuously from its organization and particularly upon the date of the execution and delivery of said assignment, was wholly and totally insolvent, and the effect of the transfer and assignment made to said defendant Bank of said account receivable aforesaid, and the realization of the sum of $3245.76 thereon was that the said defendant obtained a greater percentage of its debt (payment in full) than any other creditor of the same class, and participated and benefited in the obtaining of $1245.76 upon the payment of the note due by Henry J. Lowdon, President of Multachrom Tubelight, Inc., to the defendant bank. Defendant Bank of California at the time of taking said assignment of said account due Multachrom Tubelight, Inc. by National Theater Supply Company of New York, as security, and at the time of the realizing of said sum of $3245.76, knew and had reasonable grounds to believe that the Multachrom Tubelight, Inc. was not able to pay its debts in the ordinary course of its business, that it was insolvent, and that a preference would be effected in its favor by the receipt and acceptance of said transfer and assignment of said account receivable due Multachrom Tubelight, Inc., from National Theater Supply Company of New York, and the collection thereof, and that it thereby would secure an advantage over other creditors of the same class. That on or about July 21, 1931, plaintiff

herein made demand upon the defendant for the sum of $3245.76.''

On May 25, 1931, the Multachrom Tubelight, Inc., made an assignment for the benefit of creditors.

On the ground that the assignment to the bank of the account receivable in the amount of $3,312 constituted an unlawful preference, in that it was given in payment of a pre-existing indebtedness and at a time when the assignor was insolvent, plaintiff, assignee for the benefit of the creditors of the insolvent tubelight company, instituted this action to recover from the bank the amount paid to the bank on the assigned account. The bank answered, and as assignee of a life insurance policy of Henry J. Lowdon, now deceased, by cross-complaint against Lowdon's widow individually and against her as administratrix of the estate of her deceased husband, sought to have established in its favor a first lien upon the proceeds of the life insurance policy in question in any amount awarded by the court against the bank in favor of the plaintiff.

Trial of the cause resulted in judgment, which is amply sustained by the findings of fact, which are, in turn, supported by the evidence, in favor of the plaintiff and against the bank in the sum of $3,245.76. The defendant bank appealed from that part of the judgment. Mrs. Lowdon cross-appealed from that portion of the judgment which awards to the bank a first, prior and paramount lien in the amount of $1,245.76 upon a five thousand dollar life insurance policy given to the bank by Lowdon as collateral security and a pledge for payment of a loan by the bank to him.

Counsel for respondent contend that, as the tubelight company was insolvent at the time it assigned the theatre supply company account to the bank, an unlaw-

ful preference was created, in violation of the trust fund doctrine.

The assignment to the bank of the theatre supply company account on March 4, 1931, was made to secure payment of a pre-existing indebtedness. When the theatre supply company, on April 24, 1931, paid the bank $3,245.76, the amount (less discount) of the account assigned March 4, 1931, that money was applied, as Lowdon directed, to the payment of the balance of the tubelight company's indebtedness incurred January 16, 1931, and Lowdon's indebtedness incurred in 1930. When the original loan was made, and when the account was assigned, the tubelight company was insolvent.

We are committed to the rule that an insolvent corporation may not prefer its creditors; that a corporation's property, on insolvency, becomes a trust fund for the benefit of all of its creditors, to be equally and ratably distributed among them; and that, in an action on the part of the receiver, or assignee for the benefit of creditors of the insolvent, to recover as for an unlawful preference, it is not necessary to show that the creditor, at the time of receiving the preference, knew, or had reasonable cause to believe, that the corporation was insolvent. *Jensen v. American Bank of Spokane,* 157 Wash. 240, 288 Pac. 660.

Where a present valuable consideration passes to the insolvent corporation from the creditor, the amount paid by, or secured from, the insolvent to such creditor does not constitute a preference. *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94. Had the security been taken by the bank on January 16, 1931, when the loan of thirty-five hundred dollars was made to the tubelight company, the insolvency of the corporation at that time would not have made the trans-

action invalid. *Belcher v. Webb,* 176 Wash. 446, 29 P. (2d) 702.

Counsel for appellant contend that the case at bar falls within the exceptions to the trust fund doctrine as enunciated in *Terhune v. Weise,* 132 Wash. 208, 241 Pac. 954, 38 A. L. R. 94, and *Smith v. National Bank of Commerce,* 142 Wash. 428, 253 Pac. 644. However, in those cases, there was no violation of the trust fund doctrine, in view of the fact that the insolvent corporation gave security or transferred property for a present consideration passing to the corporation. The trust fund doctrine does not mean that the property of an insolvent corporation is so affected by the indebtedness of the corporation that it can not be sold, transferred or mortgaged to *bona fide* purchasers or lenders for a present valuable consideration. *Fogg v. Blair,* 133 U. S. 534, 10 S. Ct. 338.

There was no delivery or assignment of the theatre supply company account to the bank or any possession taken of that account until March 4, 1931. The account was assigned to the bank at that time as collateral security for a pre-existing debt—the balance due to the bank from the tubelight company on the loan of January 16, 1931. No present consideration passed from the bank to the insolvent corporation at the time the security was obtained. The collateral loan agreement of January 16, 1931, made at the time of the original loan, was given by the tubelight company as security for the loan of that date, if and when any property belonging to the company came into possession of the bank. No property ever came into the possession or under the control of the bank until March 4, 1931, when the theatre supply company account was assigned to the bank. The cases upon which appellant relies for reversal are not controlling.

On the cross-appeal, it is argued that, while Lowdon during his lifetime had a right to assign his policy of life insurance or change the beneficiary thereof, no valid assignment was made by him, nor was there any change of beneficiary.

On April 16, 1931, Lowdon left with Mr. Macklem (an officer of the bank), as collateral for the former's loan, a number of insurance policies. The policies were enclosed in an envelope on which was written:

"Mr. Macklem:

"Here are some insurance policies for additional security as requested.        (Signed) H. J. Lowdon."

The proceeds received by the bank from the theatre supply company account were applied to the retirement of the tubelight company's obligation of two thousand dollars, and the balance of $1,245.76 was applied on the demand note which the tubelight company had given to Lowdon and which he had assigned as security for payment of his personal indebtedness to the bank. The balance due from Lowdon on his note was secured by the tubelight company's note to Lowdon, and also secured by the life insurance policies left by Lowdon with the bank, as cited above. Subsequent to the application of the $1,245.76 to the payment of Lowdon's indebtedness, Lowdon made partial payments from time to time, and his loan was apparently paid in full on June 4, 1932 (this was after his death), when the balance due of seventy-five dollars was paid.

All of the insurance policies except the one which is the subject matter of this controversy were released by the bank to Mrs. Lowdon on the death of her husband. The five-thousand dollar policy in question was retained by the bank. Mrs. Lowdon is named in that policy as beneficiary thereof. The policy reserved to the insured the right to change the beneficiary without

her consent. In view of that fact, the beneficiary did not acquire a permanent or vested interest in the policy; all that she acquired was an expectancy. The debt for which the policy was given as security for payment was a community obligation. If the assignment is valid, the proceeds of the policy, upon collection from the insurance company, may be applied in payment of the debt owing by the community to the assignee.

It was not necessary to the validity of the assignment that the wife join with her husband therein. The husband, who has the management and control of community personal property, could assign such policy as security for payment of a community obligation.

■ The policy provides that

"Any assignment of this policy must be in writing, and the company shall not be deemed to have knowledge of such assignment unless the original or a duplicate thereof is filed at the home office of the company. The company will not assume any responsibility for the validity of an assignment."

Such provision does not prevent an assignment valid in equity. The provision is for the benefit of the insurer, who is not questioning the validity of the assignment, and third persons can not take advantage of a failure to comply therewith. 14 R. C. L. p. 1005, § 183.

An oral assignment of a real estate contract, which is accompanied by delivery of the contract with the intention to assign it, is an equitable assignment. *Button v. Traders Trust Co.,* 157 Wash. 625, 289 Pac. 1010. In the case at bar, the insurance policy was delivered by the borrower to the lender under an agreement with the lender that the policy should be held by the lender as security for payment of the loan. We may disregard the so-called written assignment; there was an equitable assignment. The policy was orally

assigned and delivered as security for payment of a community obligation.

It is not essential to the validity of an assignment of an insurance policy that the assignment be in writing. Life insurance policies may be validly assigned by parol and delivery, the same as other written contracts, in the absence of express statutory or enforcible contract provisions to the contrary. No statute forbidding parol assignments of life insurance policies has been called to our attention. The policy provision requiring that the assignment be in writing is for the benefit of the insurer, and only the insurer can take advantage of a failure to comply with that provision.

"It has been declared that, in order to vest the legal title to a life insurance policy in an assignee, it is essential that the assignment should be in writing, but the better and quite generally accepted rule is that such an assignment need not be in writing to be valid; in other words, that life insurance policies may be validly assigned by parol, the theory being that such a contract is governed in this respect by the rules applicable to ordinary, simple, written contracts; this, of course, in the absence of express statutory or enforceable contract provision to the contrary, and provided the vested interests of third persons are not adversely affected without their consent. So, a parol assignment, accompanied by delivery, is valid, even though the assignee has no insurable interest, if the insurer has acquiesced in the assignment. In such case the assignee is vested in equitable title, at least to the proceeds. . . . But even though the policy prohibits oral assignments, the validity thereof can only be questioned by the insurer." 6 Couch Cyc. of Insurance Law, § 1458d, p. 5195.

The judgment is affirmed on the appeal and on the cross-appeal.

BEALS, C. J., MITCHELL, STEINERT, and BLAKE, JJ., concur.